(*Circuit Court of Cook County. In Chancery.*)

## J. J. Townsend, et al.

### vs.

## Chicago Union Traction Company, et al.

(July 5, 1905.)

1. JURISDICTION OF COURTS—CONFLICT BETWEEN STATE AND FEDERAL. The pendency in a Federal court, of a creditors' bill filed by certain judgment creditors under which receivers were appointed, with authority to operate the property under the orders of the court, is not a bar to a subsequent proceeding instituted in the state court by minority stockholders, to restrain the corporation, its officers and directors, from entering into and carryng out certain contracts alleged to be *ultra vires.*

2. SAME—RES ADJUDICATA. Where the Federal court has decided that there is no conflict, this is not conclusive on the state court.

3. SAME—CREDITORS' BILLS—NATURE OF. A creditors' bill filed in a Federal court against a corporation to collect unpaid judgments, is not in the nature of a winding up proceeding and does not subject either the corporation or its stockholders to the exclusive jurisdiction of such court, in their relations with each other.

4. RECEIVERS—WHETHER NECESSARY PARTIES TO STOCKHOLDERS' SUIT. The receivers of a corporation are not necessary parties to a minority stockholders' suit, where the controversy relates to the voting power of certain stock held by a trustee, the legality of an election of, and the extent of the power of directors, etc.

5. PARTIES—CESTUI QUE TRUST. A *cestui que trust* is not a necessary party to litigation in which he is represented by the trustee.

6. INJUNCTION—ANNULLING PAST ACTS. Where a bill is filed to restrain the doing of a certain act, the doing of which should and would have been enjoined, but for the intervening injunction of a Federal court, it is the duty of the court to issue the injunction to annul such acts, upon the dissolution of the restraining order in the Federal court.

7. PUBLIC SERVICE CORPORATIONS—LEASE OF PROPERTY OF. A public service corporation is without power to lease all of its property, thereby disabling itself from performing its public duties. The state or any stockholder may prevent the execution of any such lease.

8. SAME—PUBLIC POLICY. But if the public policy or statutory law of the state permits such a corporation to execute such a lease, neither the state nor any stockholder can object.

9. SAME—ULTRA VIRES—ESTOPPEL OF STOCKHOLDER. Where the property of the corporation is leased in violation of the charter any stockholder can enjoin the transaction even though the state could not object. Such right, however, is personal to the stockholder, and he may by his acquiescence estop himself and his successors in title from thereafter objecting.

10. CHANGE IN CORPORATE PURPOSE—CONSENT OF STOCKHOLDERS. Unless the law or charter otherwise provides, the unanimous consent of the stockholders is required to effect a fundamental change in the corporate purposes.

11. POWERS OF DIRECTORS—INCREASE OF CAPITAL STOCK. Where the charter provides that the capital stock may be increased and subsequently provides that all powers of the corporation are conferred on the board of directors, only the ordinary powers are referred to. The power to increase the capital stock is so fundamental a change as to require the unanimous consent of all the shareholders.

12. CORPORATIONS—STREET RAILROADS—POWER TO LEASE. Where street railroads are permitted by express statute to lease their right of way, the fact that the charter of a street railway company and the act under which the company is organized, are silent with respect to the power to lease, does not prevent the exercise of such power.

13. SAME—CONSENT OF STOCKHOLDERS. Unless the company was expressly empowered to lease its right of way, it could not by the mere act of its directors or even without unanimous consent of its stockholders, change its character from an operating to a leasing company.

14. CHANGE OF CORPORATE PURPOSE—WHETHER FUNDAMENTAL. It is doubtful whether a change by a street railway company from an operating to a leasing company, is of so fundamental a character, as to require the unanimous consent of all the stockholders.

15. LEASE OF STREET RAILWAY—CHANGE IN SAME—ESTOPPEL OF STOCKHOLDERS. Where a lease of a street railway which is not *ultra vires* in the sense that it is not void, has been acquiesced in by all of the shareholders, the shareholders are likewise estopped to question an amended lease which changes the terms of the original lease. The acquiescence of the shareholders in the original lease is not merely a consent to the terms of such lease, but also a consent that the fundamental character of the corporation should also be changed from an operating to a leasing company.

16. POWER OF BOARD OF DIRECTORS TO LEASE PROPERTY. Where a street railway company leases its right of way under legislative authority, the board of directors have power to make changes in such lease.

17. BOARD OF DIRECTORS—VACANCIES—HOW FILLED. The statute in relation to the election of directors provides that directors must be elected by the stockholders and states that "all *other* vacancies to be filled in accordance with by-laws." *Held* that inasmuch as it was the universal practice in Illinois for at least 35 years to permit vacancies in the board of directors to be filled by the other members of the board, that the court would not overthrow such a long settled practice, by holding that such vacancies must be filled by the stockholders.

18. MAJORITY OF STOCKHOLDERS—WHAT CONSTITUTES. The directors of a street railway company made a lease of the company's right of way, contingent upon the approval of a majority of the stockholders and provided for the calling of a special meeting of the stockholders "for the purpose of considering and voting upon the question of approving the action of the board of directors." Part of the stock, the property of the lessee, was held in trust under a deposit agreement, to secure the performance of the lease. *Held* that such deposited stock was incapable of being legally voted by the trustee, and therefore should not be taken into consideration in determining whether a majority of the outstanding stock had voted in favor of the lease.

19. CORPORATIONS—ACQUISITION OF STOCK IN OTHER CORPORATIONS. It is against public policy for one corporation to acquire a *majority* of the stock of another corporation for the purpose of controlling it. The holding of stock in other corporations for some purposes is not necessarily *ultra vires.*

20. SAME—RIGHT OF LESSEE STREET RAILWAY COMPANY TO OWN SHARES OF STOCK OF LESSOR COMPANY. It is not against the public policy of Illinois for one street railway company to hold stock in another street railway company under certain circumstances, and where a lessee company is required to make a deposit in money or securities to secure the performance of the lease, the lessee corporation had the implied power to invest its funds in the shares of stock of the lessor company, as incident to the express power of acquiring a street railroad by lease, such purchase not being made for the purpose of securing control of the lessor company.

21. STOCKHOLDER—RIGHT OF RECORD HOLDER TO VOTE. The corporation and the other stockholders are not concerned with the beneficial ownership in determining the right of a stockholder of record to vote.

22. STREET RAILROADS—LEGISLATIVE POWER TO LEASE. Under the act of 1855 (Pr. L. 1855, p. 304) railroad companies have the power to lease their entire road.
23. SAME—LEASE TO NON-OPERATING COMPANY. It is not essential that the lessee railroad should at the time of the lease be an operating company.
24. SAME—RIGHT OF STOCKHOLDERS TO ATTACK LEASE. A stockholder of a lessor street railway company has no standing to attack an amendatory lease on the ground that it was made to a non-operating company, where such stockholder had assented to the original lease.
25. SAME—WHETHER COMPANY NON-OPERATING. Assuming that a lease of a street railway is inoperative because made to a non-operating company, an amendatory lease made thereafter is not invalid, where the lessee company has acquired and operated certain extensions.
26. STATUTES—REPEAL OF. The act of 1855 which permits railroad companies to enter into operative contracts, and to borrow money, is not in conflict with, and is not repealed by, the general incorporation act of 1872, or by the act of June 9, 1897, in relation to street railroads.

Bill for injunction. Motion for preliminary injunction. Heard before Judge Julian W. Mack. Motion denied.

*Moran, Mayer & Meyer,* for complainants.

## I.

The consent of the legislature is an indispensable prerequisite to enable a railroad company to sell or lease all, or substantially all of its corporate property, and in the absence of such authority, such a sale or lease will not only be *ultra vires,* but it will also be against public policy and therefore void, and will be enjoined at the suit of a single stockholder. *New Albany Water Works v. Louisville Banking Co.,* 122 Fed. 776 (7th C. C. A.). (Single stockholder can enjoin; whether the contract be beneficial or injurious is immaterial); *Colman v. Eastern Co. Ry. Co.,* 4 Eng. Ry. & Canal Cases, 382, 514; s. c. 16 Law Jour. (N. S.) Eq. 73 (a stockholder's bill to restrain execution of lease. Complainant's motives held immaterial. Cited in 15 Ill. 399, and 101 Ill. 286); *Chicago Union Traction Co. v. City,* 199 Ill. 484, 542; *Board*

*v. Lafayette, etc. R. R.*, 50 Ind. 85, 108, 109 (bill by stock-holder to enjoin lease) ; *Beman v. Rufford*, 20 Law Jour. (N. S.) Eq. 537 (stockholder's bill to enjoin twenty-one-year lease. Cited in 15 Ill. 399, 61 Ill. 422) ; *Thomas v. Railroad Co.*, 101 U. S. 71, 79–86 (twenty-year lease) ; *Pennsylvania R. R. Co. v. St. L., Alton & T. H. R. R. Co.*, 118 U. S. 290, 306–309, 313 (action on lease and guarantee) ; *Chicago Gas L. & C. Co. v. People's Gas L. & C. Co.*, 121 Ill. 530, 539–541, 546 ; *Peoria & R. I. Ry. Co. v. Coal Valley Mining Co.*, 68 Ill. 489, 491, 494 ; *Hays v. Ottawa, etc., R. R. Co.*, 61 Ill. 422 ; *Am. L. & T. Co. v. Minnesota, etc., R. R. Co.*, 157 Ill. 641, 651, 652 ; *Cent. Trans. Co. v. Pullman's Palace Car. Co.*, 139 U. S. 24, 40–42, 44, 45, 47–53 ; *Oregon Ry. & Nav. Co. v. Oregonian Ry. Co.*, 130 U. S. 1, 30, 34, 37 ; *Union Pac. Ry. Co. v. C. R. I. & P. R. R. Co.*, 163 U. S. 564, 581 ; *E. St. L. C. Ry. Co. v. Jarvis*, 92 Fed. 735 (7th C. C. A.) ; *Cent. Trust Co. v. I. & L. M. R. Co.*, 98 Fed. 666 (7th C. C. A.)

## II.

A corporation has no powers not expressly granted to it by its charter or statute, and an enumeration of powers implies the exclusion of all others. *Am. L. & Tr. Co. v. Minnesota, etc., R. R. Co.*, 157 Ill. 641, 651, 652 ; *Thomas v. R. R. Co.*, 101 U. S. 71, 82 ; *Central Transp. Co. v. P. P. Car Co.*, 139 U. S. 24, 40–44, 47, 48 ; *New Albany Water Works v. Louisville Banking Co.*, 122 Fed. 776 (7th C. C. A.) ; *Colman v. Eastern Co. Ry. Co.*, 4 Eng. Ry. & Canal Cases, 382, *514 ; s. c. 16 Law Jour. (N. S.) Eq. 73 ; *Mayor v. K. & O. R. Co.*, 22 Fed. 758 ; *Board v. Lafayette, etc. R. R.*, 50 Ind. 85, 108 *et seq.*; *People v. Ballard*, 134 N. Y. 269, 294, 295 (cited in Glucose case, 182 Ill. 631) ; *Alexander v. Atlanta, etc., Co.*, 33 S. E. 866.

## III.

A. The general incorporation act of Illinois does not specify the right to lease all its property, among the powers delegated to a corporation, but such power is in effect denied to the corporation. It may only sell and dispose of property

"when not required for the uses of the corporation." Ch. 32, sec. 5, Ill. Corp. Act; *Forrester v. Boston, etc., Co.,* 55, Pac. 229 (opinion denying re-hearing; id. 353). This case strongly illustrates how strictly similar statutes must be construed; *Central Transp. Co. v. Pullman's P. Car. Co.,* 139 U. S. 24, 47; *Am. L. & T. Co. v. Minnesota, etc., R. R. Co.,* 157 Ill 641, 651, 652; *Alexander v. Atlanta R. R. Co.,* 33 S. E. 866.

B. The act of 1855 (Priv. Laws Ill. 1855, pp. 304, 305) has no application here because the parties to the leases complained of were incorporated under the general incorporation act, which prohibits the execution of said leases. Chap. 32, secs. 5, 49, Ill. Statutes, Corp. Act.; *Board v. Lafayette, etc., R. R.,* 50 Ind. 85, 114 (holds a lease to be substantially a sale); and to the same effect are *Pennsylvania R. R. Co. v. St. L., Alton & T. H. R. R. Co.,* 118 U. S. 290, 313; *Mills v. Central R. R. Co. of N. J.,* 41 N. J. Eq. 1, 3; *Dow v. Northern R. R.,* 36 Atl. (N. H.) 510; *Cent. Transp. Co. v. Pullman's P. Car Co.,* 139 U. S. 24, 48, 53.

C. Besides, the act of 1855 has reference only to operating companies, and not to a corporation which, like the Traction Company, neither owns nor operates any railroad. Act of 1855, *supra* (examine all three sections and title.); *Union Traction Co. v. City,* 199 Ill. 484, 510, 512, 513, 527, 537, 538, 542–545; *Union Traction Co. v. City,* 199 Ill. 579, 605; *Coler v. Tacoma Ry. & Power Co.,* 54 Atl. 413 (N. J. 1903, stockholder's bill); *Thomas v. Railroad Co.,* 101 U. S. 71; *Central Transp. Co. v. Pullman's P. Car Co.,* 139 U. S. 24, 49–53.

D. But if the new leases are *ultra vires* the lessee company only, then they will be void as to all parties. *Chicago Union Traction Co. v. City,* 199 Ill. 484, 543; *Cent. Transp. Co. v. Pullman's P. Car Co.,* 139 U. S. 24, 45, 54.

## IV.

A. The making of the new leases was not "among the ordinary powers" of the parties thereto, nor among the powers which the board of directors could exercise. The new leases constituted fundamental and organic corporate changes.

*Nashua & L. Co. v. Boston & L. R. Co.*, 27 Fed. 821, 826; *Metropolitan Elev. R. R. Co. v. Manhattan Elev. R. R. Co.*, 11 Daly, 373, 468–485; *Pennsylvania R. R. Co. v. St. L., Alton & T. H. R. R. Co.*, 118 U. S. 290, 309, 313; *Cent. Transp. Co. v. Pullman's P. Car Co.*, 139 U. S. 24, 45, 47; *Oregon Ry. & Nav. Co. v. Oregonian Co.*, 130 U. S. 1, 30; *Thomas v. Railroad Co.*, 101 U. S. 71; *Coler v. Tacoma Ry. & Power Co.* (N. J. 1903), 54 Atl. 413; *Reed v. Atlantic & R. R. Co.*, 85 Fed. 692; *Stevens v. Rutland & B. R. R. Co.*, 29 Vt. 545; *Dow v. Northern R. R.* (N. H.) 36 Atl. 510 (there, statute authorized lease by vote of two-thirds of stockholders; held, single stockholder could enjoin); *Abbott v. American Hard Rubber Co.*, 33 Barb. 578 (approved in Glucose case, 182 Ill. 631, and in 134 N. Y. 269); *Board v. LaFayette, etc., R. R.*, 50 Ind. 85, 112, 113; *Martin v. Continental Passenger Ry. Co.*, 14 Phila. 10 (holds directors have no power to lease); *Hartford & N. H. R. R. v. Croswell*, 5 Hill, 383; *Cass v. Manchester I. & S. Co.*, 9 Fed. 640 (five-year lease; expediency of lease held immaterial); 1 Beach on Priv. Corporation, sec. 73; *Alexander v. Atlanta, etc. Co.*, 33 S. E. 866.

B. Even if the new leases were authorized by statute and were not *ultra vires*, they could only be legally executed with the consent of every stockholder, and a single dissenting stockholder could enjoin the act. *Board v. LaFayette, etc., R. R.* 50 Ind. 85, 110–114 (power to lease existed at time charter was taken out; bill by stockholder to enjoin lease); *March v. Railroad*, 43 N. H. 515, 525–527, 532, 533 (power to lease existed at time charter was issued; injunction granted to stockholder); *Ill. Grand Trunk R. R. v. Cook*, 29 Ill. 237 (prior power existed); *Metropolitan Elev. R. R. Co. v. Manhattan Elev. R. R. Co.*, 11 Daly, 373, 468–485 (power to lease existed when charter was taken out); *Railway Co. v. Allerton*, 18 Wall. 233 (prior power existed); *Eidman v. Bowman*, 58 Ill. 444, 446, *et seq.* (prior power existed); *Mills v. Central R. R. Co. of N. J.*, 41 N. J. Eq. 1, 3, *et seq.* (statute held to be permissive only); *Mayor v. K. & O. R. R. Co.*, 22 Fed. 758; *Stevens v. Rutland & B. R. R. Co.*, 29 Vt. 545, 547, (statute held not mandatory but permissive only; expediency and

complainant's interests held immaterial); *Dow v. Northern R. R.* (N. H.) 36 Atl. 510 (statute authorized lease on vote of two-thirds of stockholders; held, single stockholder could enjoin, and question of advantage or disadvantage is immaterial); *Stevens v. Davison*, 18 Gratt. 819 (lease there was held oppressive and a fraud in law; stockholders must approve at a stockholders' meeting); *Clearwater v. Meredith*, 1 Wall. 25 (statute held to be permissive only); *Union Pac. Ry. Co. v. Chicago, R. I. & P. Ry. Co.*, 163 U. S. 564, 596; *Kean v. Johnson*, 9 N. J. Eq. 401; *Earle v. Seattle, etc., Co.*, 56 Fed. 909 (receiver appointed on stockholders' application); *Smith v. Bangs*, 15 Ill. 399, 402; *Hartford & N. H. R. R. v. Croswell*, 5 Hill, 383; *Alexander v. Atlanta R. R. Co.*, 33 S. E. 866; *Banet v. Alton & S. R. R. Co.,* 13 Ill. 504, 511–513; 2 Beach on Private Corporations, sec. 430; 2 High on Injunction (3d ed.), sec. 1192.

C. The same rule obtains in the case of manfacturing and trading corporations where the question of public policy is absent. Although such corporations have the power to sell or lease all their property, yet the power can only be exercised with the consent of every stockholder, and a single stockholder can enjoin the exercise of such power. *Post v. Beacon Vacuum P. & E. Co.* (C. C. A.), 84 Fed. 371; *Small v. Minneapolis Electro-Matrix Co.*, 45 Minn. 264 (approved in Glucose case, 182 Ill. 631); *Abbott v. Am. Hard Rubber Co.*, 33 Barb. 578 (approved in Glucose case, 182 Ill. 631, and in 134 N. Y. 269); *Forester v. Boston, etc., Co.*, 55 Pac. 229, and opinion denying re-hearing; id. p. 353; *People v. Ballard*, 134 N. Y. 269, 294, 295 (cited in Glucose case, 182 Ill. 631; approves of *Abbott v. Am. Hard Rubber Co.*, 33 Barb. 578); *Byrne v. Schuyler Elec. Mfg. Co.* (Conn.), 31 Atl. 833; *Parsons v. Tacoma S. & R. Co.*, 65 Pac. 765; *Cass v. Manchester I. & S. Co.*, 9 Fed. 640; *Harding v. Am. Glucose Co.*, 182 Ill. 551, 625–633; *Elyton Land Co. v. Dowdell*, 20 So. 981.

## V.

A. An *ultra vires* contract cannot be rendered valid by the assent of every stockholder or by partial performance; nor

does the doctrine of estoppel apply by assenting to or acting under such a contract. *Durkee v. People,* 155 Ill. 354, 361, 362, 367 (no estoppel as against stockholder); *Board v. La-Fayette, etc., R. R.* 50 Ind. 85, 112 (stockholders' bill to set aside *ultra vires* lease); *George v. Cent. R. R. & B. Co.,* 14 So. 752, 757 (bill by stockholders); *Central Transp. Co. v. Pullman's P. Car Co.,* 139 U. S. 24, 59, 60 (sixteen-years' operation under lease); *Penna. R. R. Co. v. St. L., Alton & T. H. R. R. Co.,* 118 U. S. 290, 317 (ten-years' operation under a ninety-nine-year lease); *Fritze v. Eq. B. & L. Society,* 186 Ill. 183; *National H. B. & L. Ass'n. v. Home Sav. Bank,* 181 Ill. 35; *Thomas v. Railroad Co.,* 101 U. S. 71, 83, 86; *Oregon Ry. & N. Co. v. Oregonian Ry. Co.,* 130 U. S. 1, 37; *Union Pac. Ry. Co. v. C., R. I. & P. Ry. Co.,* 163 U. S. 564, 581; *Towle v. Am. Blg. L. & I. Co.,* 78 Fed. 688, 689; *Wheeler v. Home Sav. Bank,* 188 Ill. 34; *Farson v. Fogg,* 205 Ill. 326, 343; *Chicago Pneumatic Tool Co. v. Jones Mfg. Co.,* 91 Ill. App. 547; *Best Brewing Co. v. Klassen,* 185 Ill. 37; *State v. Newman,* 25 So. 408; *Union Traction Co. v. City,* 199 Ill. 484, 543.

B. The doctrine of estoppel can have no application here, if for no other reason than because the lessee has not altered its position. *Hefner v. Vandolah,* 57 Ill. 520; *People v. Brown,* 67 Ill. 435; *Salem National Bank v. White,* 159 Ill. 136.

C. Moreover, the agreements of July, 1903, are new leases. *Burgess v. Badger,* 124 Ill. 288, 298; *Metrop. Elev. Ry. Co. v. Manhattan Elev. Ry. Co.,* 11 Daly, 373, 468–494; *Henry v. Ry. Co.,* 5 Ohio Decisions (S. & C. P.) 41, 82–85; *Harkness v. Manhattan Ry. Co.,* 54 N. Y. Super. Ct. 174, 180; *Eel River Ry. Co. v. State,* 155 Ind. 433, 459, 460; 21 Am. & Ency. Law (2d ed.) 660.

## VI.

A. The Chicago Union Traction Company has no power to own either the 20,000 shares of North Chicago Street Railroad Company stock nor the 32,000 shares of West Chicago Street Railroad Company stock. *People v. Chicago Gas Trust Co.,* 130 Ill. 268; *People v. Pullman's P. Car Co.,* 175 Ill. 125, 159; *Union Traction Co. v. City,* 199 Ill. 579, 611, 612, 636, 637;

*De la Vergne, etc., Co. v. German Savings Inst.,* 175 U. S. 40; *First National Bank v. National Exch. Bank,* 92 U. S. 122, 128; *California Bank v. Kennedy,* 167 U. S. 362; *Concord, etc., Bank v. Hawkins,* 174 U. S. 364; *Easun v. Buckeye Brewing Co.,* 51 Fed. 156; *Summer v. Marcy,* 23 Fed. Cas. p. 384; *Burrows v. Niblack,* 84 Fed. 111; *Pauly v. Coronado Beach Co.,* 56 Fed. 428; *McCutcheon v. Merz Capsule Co.,* 71 Fed. 787.

B. It follows, therefore, that the Chicago Union Traction Company had no power or right to vote said stock, even though it stood of record in the name of trustee (the tripartite agreement expressly provides that the Traction Company shall vote the stock). *Milbank v. N. Y., L. Erie & W. R. R. Co.,* 64 Howard's Prac. 20 (approvingly cited in Gas Trust case, 130 Ill. 285, and in De la Vergne case, 175 U. S. 55); *State v. Newman,* 25 So. (La.) 408, holds that it is immaterial in whose name stock is held, and that there is no estoppel by acquiescence); *Union Traction Co. v. City,* 199 Ill. 579 (stock was held in name of trustee, see p. 637); *George v. Central R. R. & B. Co.,* 14 So. 752 (no estoppel by acquiescence); *People v. Gas Trust Co.,* 130 Ill. 268 (immaterial in whose name stock was held, see p. 284); *Coler v. Tacoma Ry. & P. Co.,* 54 Atl. 413 (N. J. 1903); *Menier v. Hooper's Telegraph Wks.,* 9 Ch. App. Cas. 350; *Central R. R. Co. v. Penn. R. R. Co.,* 31 N. J. Eq. 475, 494, 495 (corporation cannot hold stock indirectly); *Parsons v. Tacoma Smelting & R. Co.,* 65 Pac. 765; *Memphis, etc., Co. v. Woods,* 7 So. 108; s. c. 7 L. R. A. 605; *Pearson v. Concord R. R. Corporation,* 62 N. H. 537, 548, *et seq.;* 7 Am. & Eng. Ency. Law (2d ed.) 814 (corporation cannot hold stock indirectly); 5 Thompson, Corporations, sec. 6405.

C. It was contrary to equity for the Traction Company to vote said 52,000 shares of stock on a proposition which released the company from its own default and relieved said stock from liability, it having been deposited as security against such default. *Glengary, etc., Co. v. Boehmer,* 62 Pac. 839 (Colo. 1900); *Flynn v. Brooklyn City R. R. Co.,* 158 N. Y. 493 (this case points out the iniquity of a very similar trans-

action) ; *Chicago Hansom Cab Co. v. Yerkes,* 141 Ill. 320; *Mc-Leary v. Erie, etc., Co.,* 76 N. Y. Supp. 712 (minority can prevent oppressive contracts) ; *Parsons v. Tacoma S. & R. Co.,* 65 Pac. 765; *Atwater v. Am. Exch. National Bank,* 152 Ill. 605; *Robertson v. Bucklen,* 107 Ill. App. 369, 376–378; *Pearson v. Concord R. R. Co.,* 62 N. H. 537.

D. Deducting the votes of said 52,000 shares, the new leases were never approved in conformity with the resolutions of the board of directors. C. C. A. Rec., p. 164; *Haskell v. Read,* 93 N. W. 997, 999 (Nebr. 1903; majority means majority of outstanding stock and not majority of the stock present at the meeting) ; *Peters v. Lincoln & N. W. R. Co.,* 12 Fed. 513 (opinion by two judges. Consents cannot be treated as votes) ; 26 Am. & Eng. Ency. Law (2d ed.), 993.

## VII.

A. The election of new directors at the meeting of July 23, 1903, was illegal and consequently the new agreements were never adopted by a legally constituted board or by legally elected officers. Constitution Ill. art. xi. sec. 3. " Act Concerning Corporations" of 1872, sec. 3; *Durkee v. People,* 155 Ill. 354; *Charter Gas Engine Co. v. Charter,* 47 Ill. App. 36; *Eidman v. Bowman,* 58 Ill. 444, 446 (the power to appoint or elect directors does not devolve upon them but that power is reserved to the stockholders) ; *Waterman v. C. & I. R. Co.,* 139 Ill. 658, 665, 666, 668; *Terwilliger v. Telegraph Co.,* 59 Ill. 249; *People v. Crossley,* 69 Ill. 195, 198; *Brewster v. Hartley,* 37 Cal. 15, 24; *Dow v. Northern R. R.,* 36 Atl. 510, 523; *Small v. Minneapolis Electro-Matrix Co.,* 45 Minn. 264, 267 (followed in Glucose case, 182 Ill. 631) ; *San Buenaventura Mfg. Co. v. Vassault,* 50 Cal. 534; *State v. Anderson,* 67 N. E. 207, 209–211 (Ind. App.) ; *Hays v. Commonwealth,* 82 Pa. St. 518; *People v. Phillips,* 1 Denio, 388.

B. Directors have no power to fill "vacancies," and cannot, under the constitution, exercise such power. Section 3 of the general Incorporation Act means "unfilled positions" "other" than directors, are "to be filled in accordance with the by-laws of the corporation." See authorities under VII.

A, *supra.* "An Act Concerning Corporations," sec. 3; Angell & Ames on Corp., sec. 144; 3 Thompson on Priv. Corp., sec. 3853; *Kearney v. Andrews,* 10 N. J. Eq. 70; Century Dictionary, "Vacancy"; Bouvier's Law Dictionary, "Vacancy"; Anderson's Dictionary of Law, "Vacancy"; *In re Lewensohn,* 98 Fed. 576, 579; *State v. Curtis,* 9 Nev. 325 (cited in Durkee case, 154 Ill. 354).

C. A court of equity has jurisdiction to determine the legality of an election of directors, where, as here, property rights are involved. *Chicago Macaroni Co. v. Boggiano,* 202 Ill. 312, 316; *Leigh v. National H. B. B. Co.,* 104 Ill. App. 438, 441, 442.

*John S. Miller* and *W. W. Gurley,* solicitors for Chicago Union Traction Company.

## I.

Want of jurisdiction. Jurisdiction of Federal court prior and exclusive. This court will decline jurisdiction on ground of comity, as well as of law and of necessity. This same point is a defense on the merits.

A. This objection does not require any special form of pleading. *Farmers' Loan & Trust Co. v. Lake St. El. R. R. Co.,* 177 U. S. 51, 58; *Newman v. Commercial Bank,* 156 Ill. 530.

B. The possession of the *res* vests the court which has first acquired jurisdiction, with the power to hear and determine all controversies relating thereto. *Buck v. Colbath,* 3 Wall. 344; *Porter v. Sabin,* 149 U. S. 473; *Wiswall v. Sampson,* 14 How. 52; *Taylor v. Carryl,* 20 How. 596; *Hatch v. Bancroft Co.,* 67 Fed. 808; *Clifton v. Foster,* 103 Mass. 235; *Walling v. Miller,* 108 N. Y. 177, 178, 15 N. E. 66, 67.

C. The *res* includes all rights of action, etc. *Porter v. Sabin, supra; Sercomb v. Catlin,* 128 Ill. 556; *Richards v. People,* 81 Ill. 551, 555.

D. The judgment creditors suits' were administrative suits. *Toledo, etc., Ry. v. Continental Trust Co.,* 95 Fed. 497, 504.

E. The creditors' suits were on behalf of all creditors. *Richmond v. Irons,* 121 U. S. 27, 51.

F. The jurisdiction of the federal court includes in its scope a complete administration of the entire estate for both creditors and stockholders. *Graham v. Railroad Co.,* 102 U. S. 148, 161; *Mellen v. Moline Iron Works,* 131 U. S. 352, 366; *Hollins v. Brierfield,* 150 U. S. 371, 382, 383.

H. The bills are an equitable levy upon all the property and rights of the defendant companies. *First Bank v. Gage,* 93 Ill. 172; *Miller v. Cherry,* 2 Wall. 237.

I. The stockholders are represented by their corporations and are bound by the proceedings. *Great W. Tel. Co. v. Gray,* 122 Ill. 630; *Ward v. Farwell,* 97 Ill. 616, 617; *Hawkins v. Glenn,* 131 U. S. 319; *Glenn v. Liggett,* 135 U. S. 533 542; *Furnald v. Glenn,* 64 Fed. 49; *Ex parte Cutting,* 94 U. S. 14, 22.

J. The rights of the stockholders were in the hands of the federal court, and could not be asserted here without the consent of the Federal court, and without the presence of its receivers. *Porter v. Sabin,* 149 U. S. 473; *Swope v. Willard,* 61 Fed. 417.

K. Relief sought must correspond to the theory of the bill. *Kellogg v. Moore,* 97 Ill. 282.

L. The *res* includes not only the estate in possession, but also the shares of stock deposited in trust. *Richards v. People,* 81 Ill. 551, 555; *Sercomb v. Catlin,* 128 Ill. 556, 562; *Farmers L. & T. Co. v. Lake St. R. R.,* 177 U. S. 51, 61.

M. Court might instruct as to voting of stock. *Atkinson v. Foster,* 27 Ill. App. 63, 68; affirmed in 134 Ill. 472.

N. In any event to avoid conflict, state court will not interfere with such instructions. *Hutchinson v. Green,* 6 Fed. 833.

O. The Federal court had the power to settle all controversies between the estates, as to their obligations under the leases. 5 Thomp. Corp., sec. 6973; High, Receivers, sec. 177; *Re Croton Ins. Co.,* 3 Barb. Ch. 642, and could authorize modifications of the leases for that purpose. *Re N. Y. Ry. Co. Receivers,* 29 N. J. Eq. 67; and see changes in *res* in *Kennedy v. St. P. & P. Ry. Co.,* 2 Dillon, 448, and *Miltonberger v. Logansport Ry.,* 106 U. S. 286.

P. The court can supervise the stockholders' meeting. *Gowen's Appeal,* 10 W. N. C. 85.

Q. The vote of the stockholders on August 18, 1903, approving the leases was by the affirmative vote of a majority. *Dunbar v. Kellogg Switchboard Co.,* decided by Judge Mack. (Unreported).

## II.

The directors of the North & West Chicago Street Railroad companies were regularly and properly appointed on July 23, 1903.

A. The power of filling vacancies is incident to a corporation. *Kearney v. Andrews,* 10 N. J. Eq. 70, 72.

B. The constitution of 1870, art. 2, sec. 3, refers only to "elections for directors or managers in incorporated companies," and does not apply to the filling of casual vacancies in the board of directors; see secs. 3 and 6 of Act Concerning Corporations, approved April 18, 1872.

C. Contemporaneous legislative construction is entitled to great weight. *People v. Loewenthal,* 93 Ill. 191.

D. It is a matter of common knowledge, that it has been the universal practice for vacancies in the board of directors to be filled by appointment of the board. *C. & N. W. Ry. Co. v. Boone County,* 44 Ill. 240; *Linck v. City of Litchfield,* 141 Ill. 469.

E. The same legislative construction of a constitution has prevailed in other states. Kentucky Constitution, sec. 207; Rev. Stat. of Kentucky, sec. 55; Idaho Constitution, art. XI., sec. 4; Rev. Stat. of Idaho of 1887, sec. 2592; Missouri Constitution, art. XII, sec. 6; Rev. Stat. of Missouri, sec. 2772; Montana Constitution, art. XV, sec. 4; Montana Civil Code, sec. 434; West Virginia Constitution, art. XI, sec. 4, (1872); West Virginia Code, Ch. LIII, sec. 49; Pennsylvania Constitution, art. XVI, sec. 4; *Commonwealth v. Lintsman,* 23 Pitts. L. J. 122; Gen. Laws of Penn., sec. 23; Constitution of South Dakota, art. XVII, sec. 5; South Dakota Civil Code, sec. 2926.

F. There is a marked difference between the word "election," and the word "appointment." The vacancies referred to in the last sentence in section 3 of article II of the Constitution, which are to be filled in accordance with the by-laws

of the company are to be filled by appointments and not by election. *Wickersham v. Brittan,* 93 Cal. 34; *Magruder v. Swann,* 25 Md. 173; *State of Nevada v. Irwin,* 5 Nev. 111; *Police Commissioners v. City of Louisville,* 3 Bush, 602; *Conger v. Gilmer,* 32 Cal. 75.

G. Where by a law under which a corporation is organized, power is vested in the directors to make by-laws, such right is impliedly taken away from the body of stockholders. *People v. Sterling, etc., Mfg. Co.,* 82 Ill. 457; *Board of Trade v. Nelson,* 162 Ill. 431.

### III.

The action of the board of directors on July 23, 1903, in authorizing the execution and delivery of the amendatory agreements, was within the powers of the board of directors, and the acts of such board in that regard were and are valid.

A. "The corporate powers shall be exercised by a board of directors or managers." Hurd's Rev. Stat. 1903, chap. 32, sec. 6, p. 473.

B. The changes brought about by the amendments were not such fundamental changes as a stockholder might complain of. *Beveridge v. Elev. R. R. Co.,* 112 N. Y. 1; *Flagg v. Elev. R. R. Co.,* 10 Fed. 413; *Sprague v. The Illinois River R. R. Co.,* 19 Ill. 173; *Penn. R. R. Co. v. St. Louis, etc., Ry. Co.,* 118 U. S. 290; *Wood v. Whelen,* 93 Ill. 153–165; *Hodder v. Railway Co.,* 7 Fed. 793; *Louisville Trust Co. v. L. N. A. & C. R. Co.,* 75 Fed. 433, 449.

C. The powers exercised by the board of directors in amending the leases were within their business discretion. *Beveridge v. Elev. R. R. Co.,* 112 N. Y. 1; *Flagg v. Elev. R. R. Co.,* 10 Fed. 413, 431.

D. All the cases cited by complainants were cases where objection was made to an original leasing, sale, or consolidation, or other fundamental change, none of them being upon the point that a lease already made cannot be amended by the board of directors, without the approval of the stockholders.

### IV.

If the Chicago Union Traction Company had the right to lease the properties of the North and West Chicago Compan-

ies, under the act of 1855, and the consent of the stockholders was necessary, the consent of a majority of such stockholders was sufficient since the act of 1855 was a part of the charter contract to which every stockholder is a party. *Mayfield v. Alton Railway, Gas & Electric Co.*, 198 Ill. 528; 1 Beach on Private Corporations, sec. 353; *Nugent v. Supervisors of Putnam County*, 86 U. S. 241; *Mowrey v. Indianapolis & C. Ry. Co.*, Fed. Cas., No. 9891; *Sparrow v. Railroad Co.*, 7 Ind. 369; *Waldoborough v. Railway Co.*, 84 Me. 469; *Durfee v. Old Colony, etc., R. R. Co.*, 5 Allen, 230 (approved 143 Ill. 197); *Sprague v. R. R. Co.*, 19 Ill. 174; *Wheeler v. Pullman Iron & Steel Co.*, 143 Ill. 197.

## V.

Stockholders who have voluntarily voted for an unauthorized or *ultra vires* act or contract, or who have acquiesced therein, and have accepted benefits therefrom, are estopped to contest the legality of such action. *Coquard v. National Linseed Oil Co.*, 171 Ill. 480; *Pullen v. Coal Creek Min. & Mfg. Co.*, 42 S. W. 693; *Rabe v. Dunlap*, 25 Atl. 959, 51 N. J. Eq. 40; *Levin v. Chicago Gas Light & Coke Co.*, 64 Ill. App. 393; *Memphis & Charleston R. Co. v. Grayson*, 88 Ala. 572; *Alexander v. Searcy*, 81 Ga. 536; *Da Ponte v. Louisiana Lottery Co.*, Fed. Cas. No. 3569; *Venner v. R. R. Co.*, 28 Fed. 581; *Buford v. Keokuk, etc., Packet Co.*, 69 Mo. 611; *Stewart v. Erie & Western Transp. Co.*, 17 Minn. 372; *St. Louis R. R. Co. v. Terre Haute R. R. Co.*, 145 U. S. 393; *Rogers v. R. R. Co.*, 91 Fed. 299.

A. It is an established rule that the doctrine of *ultra vires* will not be invoked for or against a corporation, where it will defeat the ends of justice, or work a legal wrong. *Citizens Bank v. Hawkins*, 18 C. C. A. 78; *O. & M. Ry. Co. v. McCarthy*, 96 U. S. 258; *Whitney Arms v. Barlow*, 63 N. Y. 62; *Jourdain v. Long Island R. Co.*, 6 N. Y. St. Rep. 89.

## VI.

An Illinois corporation may own a beneficial interest in the stock of another corporation deposited with a trustee, and may control the voting thereof. *People v. Chicago Gas Trust Co.*,

130 Ill. 268; Act of June 4, 1897, as amended by Act of May 11, 1903; (Hurd's Rev. Stat. 1903, chap. 131 A, p. 1834).

A. One corporation may acquire the stock of another corporation, as incidental to the power to purchase, lease, or consolidate. 1 Cook on Corporations (5th ed.) sec. 314, p. 683; *Hill v. Nisbet*, 100 Ind. 341; *Wehrhane v. N. C. & St. L. R. R.*, 4 N. Y. St. Rep. 541; *Marbury v. Kentucky Union Land Co.*, 62 Fed. 335; *Dewey v. Ry. Co.*, 91 Mich. 351; *Joseph Bancroft & Sons Co. v. Bloede*, 106 Fed. 396; *MacGinniss v. Boston & M. Cons. Copper Min. Co.*, 75 Pac. 89–96; *Louisville Trust Co. v. Louisville R. R. Co.*, 75 Fed. 433.

B. One corporation may acquire stock in another in payment of a debt, or as security for a debt, or in compromise of a claim. *People v. Chicago Gas Trust*, 130 Ill. 268; *Citizens State Bank v. Hawkins*, 18 C. C. A. 78; *First Nat. Bank v. Nat. Exch. Bank of Baltimore*, 92 U. S. 122.

C. And the corporation having the power for some purposes, the question here becomes one as to the abuse of the power; and it is settled that that question can be raised only by the state. *Citizens Bank v. Hawkins, supra; Hough v. Cook Co. Land Co.*, 73 Ill. 23; *Barnes v. Suddard*, 117 Ill. 237; *Cooney v. Booth Co.*, 169 Ill. 370.

### VII.

The act of February 12, 1855, provides: "All railroad companies incorporated or organized under, or which may be incorporated or organized under, the authority of the laws of this state shall have power to make such contracts and arrangements with each other, and with railroad corporations of other states, for leasing or running their roads, or any part thereof."

A. This act applies to street railroads. *City of Chicago v. Evans*, 24 Ill. 52.

B. The powers of the Chicago Union Traction Company are not limited to the purposes of incorporation stated in its articles filed with the secretary of state. *People v. Chicago Gas Trust Co.*, 130 Ill. 268–285.

C. There are many other powers which a street railroad

may exercise, than those contained in the general incorporation act, which merely defines the powers generally incident to all corporations organized under that act. *Mayfield v. Alton Gas Co.*, 198 Ill. 528; *C. U. T. Co. v. City of Chicago*, 199 Ill. 484. This latter case recognizes the existence of this act as a part of the charter of a street railroad company. See also *St. Louis R. R. v. Terre Haute R. R.*, 145 U. S. 393.

D. The power conferred on street railroad companies to make contracts for leasing includes the making, as well as the taking of a lease. Century Dictionary, title "Lease;" *St. Louis v. Terre Haute R. R.*, 145 U. S. 393.

E. The Chicago Union Traction Co. was operating the Chicago Consolidated Traction Company prior to July 23, 1903. See *Chicago Union Traction Co. v. City*, 199 Ill. 579.

## VIII.

The act of 1855 was not repealed by the Allen bill of 1897, nor by the general corporation act of 1872. *Hunt v. R. R. Co.*, 121 Ill. 638; *C., M. & St. P. R. R. Co. v. United States*, 127 U. S. 406; *C. U. T. Co. v. The City*, 199 Ill. 484.

## IX.

The receivers of the Chicago Union Traction Company, appointed by order of the Federal court on April 22, 1903, are indispensable parties to this action, regardless of the questions of priority of jurisdiction and comity. *Taylor v. So. Pac. Co.*, 122 Fed. 147; *Knopf v. Real Estate Board*, 173 Ill. 196.

A. Upon the question of the rights of receivers in stock, see *Erie Ry. Co. v. Heath*, 8 Blatch. 536, Fed. Cas. No. 4514.

B. In a court of equity a man should either abide by a contract or repudiate it *in toto*. *Marble Co. v. Ripley*, 10 Wall. 339.

C. The validity of corporate acts must be determined by the requirements of public policy. Morawetz on Corporations, secs. 650, 653, 658.

*Henry Crawford* and *John C. Calhoun*, for certain other defendants.

## Statement of Facts.

On August 15, 1903, a bill of complaint was filed in each of these causes—in the one by certain stockholders of the North Chicago Street Railroad Company, and in the other by certain stockholders of the West Chicago Street Railroad Company. Each of the bills was filed on complainants' own behalf as well as on behalf of all other stockholders of the respective companies against the Chicago Union Traction Company, North Chicago Street Railroad Company, West Chicago Street Railroad Company, Illinois Trust & Savings Bank, John P. Wilson and certain individuals who constituted the then board of directors of said companies.

The bills alleged that the North Chicago Street Railroad Company, hereinafter referred to for brevity as the North Chicago Company, was organized under the laws of Illinois in 1886, with an authorized capital stock of 100,000 shares, having a par value of $10,000,000; that there had been issued and were then outstanding, including 20,000 shares on deposit with the bank, 79,200 shares; that the object for which said company was formed was, according to its charter, "to construct as well as purchase or otherwise acquire horse, dummy and street railroads * * * and to maintain and operate the same."

The bills further alleged that the West Chicago Street Railroad Company, hereinafter referred to for brevity as the West Chicago Company, was authorized under the laws of Illinois in 1887, with an authorized capital stock of 200,000 shares of the par value of $20,000,000; that of the capital stock there had been issued and were then outstanding, including 32,000 shares on deposit with the bank, 131,890 shares; that the object for which said company was formed was, according to its charter, "to locate * * * construct * * * purchase, lease, or otherwise acquire, maintain and operate * * * street railroads, horse and dummy railroads."

The bills further alleged that the Chicago Union Traction Company, hereinafter referred to for brevity as the Traction Company, was organized under the laws of Illinois on May 24, 1899; that the object stated in its charter was "to construct,.

own, purchase, acquire and lease street railroads  *  *  *
and to operate said roads owned and leased by it''; that its
authorized and outstanding capital stock was 200,000 shares
of common and 120,000 shares of preferred of the aggregate
par value of $32,000,000.

It was further alleged, however, on information and belief,
that the Traction Company was organized and incorporated
solely for the purpose and with the intention and object on the
part of its promoters and incorporators and subscribers to its
stock, of acquiring by lease and taking the properties of the
North Chicago and West Chicago companies. The bills then
set forth that on or about June 1, 1899, the North Chicago
and Traction Companies and the West Chicago and Traction
Companies executed written leases and a tripartite agreement
stating the substance thereof as hereinafter set forth, and al-
leged that the North Chicago Company was then indebted to
the extent of over $2,000,000 and the West Chicago to the ex-
tent of over $1,000,000, evidenced by notes; that under the
tripartite agreement the $10,000,000 fund deposited by the
Traction Company with the bank was to be kept invested in
such securities as should be designated by the Traction Com-
pany, which was to receive the income therefrom until it
should make default in any obligation under the lease; that
after any default such income and so much of the principal
as should be required, should be distributed and applied from
time to time for the payment and discharge of the obligations
assumed by the Traction Company under the leases; that in
the event that stocks of corporations should constitute a part
of the deposit the trustees should always vote the same in ac-
cordance with the directions of the Traction Company and
should on request execute a proxy to vote such stock to such
person as might be designated from time to time by the
Traction Company; that in lieu of $10,000,000 cash by mutual
agreement the Traction Company had deposited 32,000 shares
of the capital stock of the West Chicago and 20,000 shares of
the capital stock of the North Chicago Company.

The bills then recite the proceedings in the federal court,
on April 22d, 1903, by the Guaranty Trust Company against

the North Chicago, West Chicago and Traction Companies respectively, under which judgments by confession were entered against each of these companies; that on these, a separate creditor's bill was filed on behalf of the judgment creditors and all other creditors; under which receivers were appointed for each of the companies with authority to operate the property under the order of the court. The bills alleged that all of these proceedings were begun pursuant to an agreement between the Guaranty Trust Company and the Traction Company that they should be so begun and that the Traction Company ought to have paid the notes given by the lessor companies on which the judgments were based.

The bills then recite the history of the Traction Companies on the West and North Sides of Chicago from the incorporation of the North Chicago City Railway Company in 1859, and the Chicago West Division Railway Company in 1861, the acquisition by the North Chicago Company as lessee for 999 years of all of the rights of the North Chicago City Railway Company, and by the West Chicago Company as lessee for the same period of all of the rights of the Chicago West Division Railway Company, said leases being dated May 24, 1886, and October 20, 1887, respectively; that under each of said leases a stipulated rental was to be paid quarterly; that shortly after said leases each of the said lessee companies had acquired a majority of the capital stock of its lessor company.

The bills then recite various large indebtednesses of the Traction Company; that its property consists solely of the railways demised and operated by it as theretofore shown together with the franchises pertaining to the same and that the total value of all the property of the Traction Company is many millions less than its liabilities; that the said North Chicago and West Chicago Companies were very prosperous until the leases of June 1, 1899, were executed; that the market value of their stocks has steadily decreased; that the total receipts of the Traction Company were entirely insufficient to pay its fixed charges and operating expenses; whereas said lessor companies if operated separately could continue to pay dividends of 12 per cent. and 6 per cent. respectively.

The bills then recite that at a meeting of each of the lessor companies on July 23, 1903, each of the then directors of the company resigned separately and that at said meeting, which it is alleged was controlled by the representatives of the Traction Company, a new board of directors was pretended to have been elected; that said meetings were held secretly without notice to stockholders; that all of said new directors, are in the employ of or interested as stockholders or otherwise in the Traction Company, that a minority of them were not at the time of their election interested in the lessor companies and that all of them were selected as directors by the officials in control of the Traction Company and are under the control of said Traction Company; that in May, 1903, certain persons at the instigation of the officers of the Traction Company held themselves out publicly as a committee of stockholders of each of the lessor companies selected for the sole purpose of protecting the interest of only the stockholders of said companies respectively; that they negotiated with the officers of the Traction Company with a view of bringing about a plan of reorganization; that without consulting all the stockholders of the lessor companies the protective committee advised the acceptance of a plan devised by the Traction Company's attorneys whereby it was proposed to amend the terms of the June 1, 1899, leases, and also to amend the tripartite agreement; that if said amendatory agreements became effective they would inure to the benefit of the Traction Company and not to the benefit of the lessor companies; that said agreements were not for the best interests of the lessor companies, but were prejudicial and injurious to its best interests and to those of its stockholders; that to enable the Traction Company to bring about the execution of the amendments the newly elected directors adopted a resolution that the president and assistant secretary of said lessor companies respectively be directed in the name of the company to execute the amendatory agreements, and that the action of the board of directors be subject to the approval of the holders of a majority of the stock of the lessor companies respectively at meetings to be called for that purpose; that the agreements be deposited with

John P. Wilson in escrow to be turned over in case and when the same should be so approved by a majority of the stockholders and that a special meeting of the stockholders be called for the 18th day of August, 1903, at 2 p. m. for the purpose of considering and voting upon the question of approving such action, and for the transaction of such other business as might come before the meeting.

The bills then charge that by reason of the illegality of their elections, none of the newly elected officers and directors had any lawful power to call such meetings or to bind any of the companies, and that the meetings would be illegal; that if a majority of the stockholders of said companies should ratify the action of the directors the escrow documents would be delivered and the companies would insist that they were in full force; that it would be to the interest of the Traction Company that the agreements be ratified; but that in order that a majority of the stockholders might appear to have voted in favor of the agreements the Traction Company claimed the right to require the bank to vote the deposited stock in accordance with its directions, and that unless prevented by the action of this court it would direct the bank to vote such stock in favor of ratification; that the Traction Company had no right to own or vote any of said stock, or to direct and control how or by whom it shall be voted, and that the ownership of the stock was *ultra vires,* the Traction Company; that the proposed amendatory leases tended to stifle competition between public corporations and to create an unlawful monopoly and were opposed to public policy and prohibited by and contrary to the laws of Illinois; that none of said companies had the power under its charter and the laws of Illinois to enter into said proposed amendatory agreements, and that each of said proposed amendatory agreements was *ultra vires* each of said companies; that the said lessor companies were liable to and would have their charters forfeited if they entered into said proposed amended leases, inasmuch as to do so would be *ultra vires* acts, and that by such forfeiture the complainants' interests as stockholders would be injuriously affected; that if they be declared consummated by the par-

ties, they would be void and a cloud upon the title of the property of the lessor companies and an impairment of the vested property rights of the complainants; that the financial interests of the directors of the lessor companies lay with the Traction Companies and not with the lessor companies, and that they were so under control of the Traction Company that it would be useless to demand of them to take any steps in the name of the company to prevent the proposed agreements or to foreclose the lien of the lessor companies on the deposited stock.. The prayer of the bills is, that the Traction Company be decreed to pay the lessor company whatever sum shall appear to be due it on taking an account and that in default thereof the deposited stock, subject to the rights, if any, which it may appear that any persons or receivers might rightfully have in and to said shares of stock, may be sold to satisfy such debt; that the Traction Company be enjoined from directing the bank how the deposited stock should be voted or requesting the bank to execute a proxy to vote said shares and from designating any person as such proxy; that the bank be enjoined from voting or permitting any one to vote by proxy or otherwise any of such stock; that each of the lessor companies be enjoined from permitting any of the deposited stock to be voted; that John P. Wilson be enjoined from delivering the agreements held in escrow; that the lessor companies be enjoined from in any manner altering or waiving the leases or the tripatite agreement of June 1, 1899; that a receiver be appointed of all of the deposited stock, subject, however, to such rights as any person or persons might rightfully have therein.

On June 24, 1904, complainants filed supplemental bills alleging that immediately on the filing of the original bills a summons was issued and placed in the hands of the sheriff together with a notice to be served on the defendants that on August 17, 1903, complainants would ask for an injunction in accordance with the prayer of the bills; that about the time the original bills were filed and before the sheriff was able to serve all of the defendants with the notice, the railroad and traction companies petitioned the circuit court of the

United States in the creditors' bills therein pending for, and on said day procured, an order restraining the prosecution of these suits, and on August 16, 1903, a rule was procured upon the complainants and their solicitors to show cause why they should not be attached for contempt of the Federal court; that, on October 9, 1903, the Federal court directed that the restraining order of August 15th, be continued in force and made a permanent order of injunction; that said order was appealed from and on April 16, 1904, was reversed and set aside by the United States circuit court of appeals, but that the mandate was withheld until on or about June 3, 1904. The supplemental bills further recite that the special meetings were held on August 18, 1903, pursuant to the call; that at the North Chicago meeting 56,581 shares were present in person or proxy, of which 56,499 were voted in favor of and 132 against the resolutions; that the Traction Company caused to be voted in favor of the resolution the 20,000 shares of deposited stock; that complainants were present and protested against this; that at the West Chicago meeting 95,326 shares were present in person or by proxy, of which 93,326 shares voted in favor of and 2,000 against the resolution; that the Traction Company caused to be voted the 32,000 shares of deposited stock in favor of the resolutions, and that the complainants were present and protested. Complainants further charge that if the deposited stock be not counted then 3,152 shares less than a majority of the North Chicago stock and 4,620 shares less than a majority of the West Chicago stock voted in favor of the adoption of the resolutions, and that at the time the deposited stock was voted it was already subject to forfeiture and sale by reason of the defaults of the Traction Company, and that notwithstanding this, it was voted in favor of releasing the company from its own default. The supplemental bills further charge that since said date the companies claim that the amendatory leases and agreements are now in full force, and that the original leases and agreements no longer have any force; that rental and other large sums are being paid out by the companies under the amendatory agreements; that the complainants have always protested

against the amendatory agreements and that none of their stock voted in favor of the resolutions. The additional prayer of the supplemental bills was, that the amendatory leases and agreements be decreed never to have become effective, never to have been legally executed, and to be *ultra vires* the parties thereto, and to be illegal and void and beyond the power of the lessor companies to execute, and to be of no effect as against the complainants; that the officers and directors of the lessor companies be enjoined from acting as such or transacting any business in the name of the company; that the defendants be enjoined from transacting any business under or ratifying the validity of the amended agreements, and that it be decreed so far as respects the complainants that the lease and tripartite agreement of June 1, 1899, are in full force and wholly unaffected by the amendatory agreements.

On June 27, 1904, the Traction Company filed its answer setting forth in full the proceedings in the Federal court including the assignment by the lessor companies to the receivers of all of their property pursuant to the orders of that court and charging that by virtue thereof the Federal court had prior and exclusive jurisdiction of all matters embraced in the original and supplemental bills.

The answer denied that the Traction Company was organized with any other intention or for any other object than that stated in its charter and charged that as the complainants had been stockholders long prior to June 1, 1899, they were estopped from objecting to the execution of the leases of said date as *ultra vires* or illegal. It further denied every intendment of collusion in reference to the proceedings against each of the companies in the Federal court; it denied that its assets consisted entirely of the property demised under the leases and charged that since the making of the leases it had acquired divers property real and personal for the purposes of its corporate business. It further denied that it had been paying dividends of 12 per cent. and 6 per cent. respectively to the stockholders of the North and West Chicago Companies since the execution of the leases, but charged that it had paid to the lessor companies the rental reserved and that said rental

for convenience was distributed *pro rata* among the stockhold-
ers of record, and that such rental amounted to 12 per cent.
upon the capital stock of the North Chicago and 6 per cent.
of the capital stock of the West Chicago Company, and that
the receivers had continued to pay such rental and had dis-
tributed the same pro rata among the stockholders as was au-
thorized by the terms of the lease until July 15, 1903.   The
answer then sets forth various reasons for the depreciation
in the net earnings of the Traction Company, among others
the heavy taxation, the increase in the price of labor and ma-
terials, and the inauguration of the universal transfer sys-
tem.   It denied that either of the lessor companies if operated
separately could continue the payment of 12 per cent. and 6
per cent. dividends respectively, or anything like such divi-
dends.   It denied that the special meetings of the board of
directors were in any manner influenced or controlled by the
Traction Company and alleged that on the contrary they were
conducted by and on behalf of the lessor companies pursuant
to the by-laws and in conformity with the law.   It further
denied that any of the new directors of the railroad compa-
nies were in the employment of or interested as stockholders
in the Traction Company, but that on the contrary each of
them was the owner of stock in that company of which he
had been elected a director.   It further denied that all or any
of said directors were prior to their elections selected as such
directors or were then under control of the Traction Company,
or that they are now or ever were subservient to or under the
control of the Traction Company.   It further denied that the
protective committees acted or were selected at the instigation
of the Traction Company, but, on the contrary, alleged that
they were selected by persons holding and owning a majority
of the capital stock of the lessor companies (outside of the de-
posited stock).   It further alleged that the negotiations re-
sulting in the amendments were conducted by the protective
committees on their own motion on the advice of their own
counsel after a thorough examination and were not influenced
or attempted to be influenced by the Traction Company.   It
denied that the amended leases would inure to its benefit and

not to the benefit of the lessors, or that they were not for the best interests of the lessors, or that the amendatory leases tend to stifle competition between public corporations or create an unlawful monopoly, or that they are opposed to public policy or prohibited by or contrary to the laws of Illinois, or that any of the companies has not the power under its charter and the laws of Illinois to enter into said amendatory agreements, or that any of said companies will have its charter forfeited if any of said amendatory agreements are entered into. The defendant further denied that the property rights of the complainants as stockholders would be injuriously affected by the adoption of the amendatory agreements, or that they would constitute a cloud upon the title of the property of the railroad company, but alleged that on the contrary they would be greatly to the benefit of the complainants as such stockholders. It further denied that the financial interests of the directors of the lessor companies lies with the Traction Company and not with the lessor companies, or that they are under the control of the traction companies so as to render a demand of them useless, but it alleged that on the contrary the financial interests were solely with the lessor companies.

The defendant further answering alleged that every stockholder had since the execution of the original leases received and accepted as rental under the lease his proportion of such rental and thereby had sanctioned and ratified the lease; that the complainants during their entire ownership of stock up to September, 1903, had likewise received and accepted such rental and were thereby estopped.

The defendant further alleged that the protective committee were elected and always remained free from any influence on the part of the Traction Company; that they had immediately insisted upon the defendant agreeing to a change in the board of directors; that they had had entirely independent counsel and were in no manner influenced by the defendant or its representatives; that the discussion between the two sides extended over several weeks and were most thorough in every respect; that on July 25th, 1903, the protective committee mailed to every stockholder including the com-

plainants, a statement showing the advantages and disadvantages of the amendment, and also mailed to each of them a copy of the amendments and modifications to the leases and tripartite agreements.

Defendant further answering alleged that of the 22,619 shares of North Chicago stock not voting at the meeting all except a few shares, not exceeding in number 1,778, had since assented to and acquiesced in the amendment and received and accepted the benefits thereof, and that of all the remaining shares of the West Chicago Company which did not vote at said meeting the holders of all except a few shares, not exceeding in number 1,218, had since assented to and acquiesced in the amendments and received and accepted the benefits thereof. It alleged further that the proxies appointed to vote the deposited stock in no respect whatever acted under the control of the Traction Company, but in every respect acted independently of the company and solely in the interest of the lessor companies; that the holders of the proxies were directors in the lessor companies.

The defendant denied that it itself had done anything under the agreements since August 18th, 1903, or that any moneys had been paid out thereunder by it or with its consent, but it alleged that without its procurement or consent the receiver of its property did under order of the Federal court and with the consent of the complainant in the suit in the Federal court pay the rental of October 15th, 1903, due under the amendatory lease, and that by request of the North and the West Chicago Companies the receivers distributed the rental to the stockholders of the North and West Chicago Companies not including the deposited stock, *pro rata;* and that all of the stockholders except complainants and a few others holding altogether not more than 1,807 shares of the North Chicago Company, and 1,216 shares of the West Chicago Company had accepted and received said money under said amended agreements as payments thereunder, and with full knowledge thereof.

Appended to the answer of the Traction Company and as exhibits thereto are the various leases and agreements.

The important changes in the leases are as follows:

First. Under the original lease the railroad company "sells, assigns, transfers and sets over to the Traction Company" the 999 year lease of May 24th, 1886, which it had received from the railway company; under the amended lease the railroad company; "does hereby grant, demise, lease and sublet" unto the Traction Company "all the railways and other property held by it under the said lease of May 24th, 1886, for the term of 984 years from June 1st, 1889."

Second. Under the original lease the railroad company further demised and leased to the Traction Company all railways owned and operated by it and as the same might thereafter be located or constructed, together with all its moneys, securities and choses in action for the full term of years extending during the unexpired charter life of the railroad company (which was 99 years from the date of the charter), and *all extensions or renewals thereof*. Under the new lease, securities and choses in action are omitted, but "all contract and ordinance rights, franchises and privileges," are added. The new lease is moreover for the full term of 984 years from the 1st day of June, 1899.

Third. The new lease adds the provision that new equipment, extensions, improvements, and ordinance rights shall become and remain subject to the lease as though forming part of the demised property.

Fourth. Under the old leases the rental to be paid was equivalent to a 12 per cent. dividend on the North Chicago stock and a 6 per cent. dividend on the West Chicago stock, and was expressly agreed to be paid. In addition to other obligations, the Traction Company further assumed and agreed to pay or renew all notes, bonds or mortgages of the railroad company and the accruing interest thereon, and covenanted, for the purpose of securing the payment of the rent and the performance of the other obligations, to deposit with the Illinois Trust & Savings Bank such amount as might be determined by the tripartite agreement; the agreement fixed this amount at $10,000,000 in cash or securities. Under the amended lease the Traction Company agreed to pay all inter-

est and other charges upon the mortgage, bonds and other indebtedness of the railroad company and all interest and sinking fund payments maturing upon the mortgage bonds or other obligations that might be issued for reconstruction and extension. As rental, however, it agreed to pay quarterly the entire net earnings from the operation of the demised road, provided this did not exceed a sum equivalent to an annual dividend of 12 per cent. and 6 per cent. respectively to the lessor companies, and any accumulated rentals. If the net earnings for any quarter-year should be less than this amount, an amount equal to the difference should be paid by the Traction Company as additional rental out of its net earnings from all its other railways after payment of rentals and other fixed charges; but as a similar agreement is made with both roads if the net earnings are insufficient to satisfy both obligations then they shall be divided in proportion to the deficiencies; but any deficiency remaining shall not, except as thereinafter provided, constitute a charge against the Traction Company or the subsequent earnings of its railways. If for any quarter-year the earnings shall be less than enough to pay a minimum rental equal to 6 per cent. and 3 per cent. annual dividends, respectively, the deficiency shall be a cumulative charge against the net earnings of the demised property and of the other properties of the Traction Company, and shall be paid without interest out of the first surplus of such earnings in the same or in subsequent years remaining after the payment of current rental or other fixed charges thereon to the extent and as long as there shall be any surplus earnings and before any dividends shall be declared on the stock of the Traction Company.

The Traction Company guarantees that its net earnings will be sufficient to pay the minimum 6 and 3 per cent. dividends respectively, on the 15th day of October, 1908, and on each subsequent rent day and it expressly agrees to pay said fixed minimum rentals quarterly. The term "net earnings" with reference to the demised property, shall include all income from said property subject to the deductions specified. All fares, tolls, profits, use and benefit from the demised

property shall be included in determining the income there-from; there shall be deducted from the gross income to ascertain net earnings the following items: All amounts which the Traction Company must pay under the leases of 1886 and 1887; interest and other charges on the bonds of the railroad company; such proportion of any deficiency arising from the operation or control of existing feeders or connecting lines as may be agreed upon between the two railroad companies and the Traction Company; interest and sinking fund payments on mortgage bonds or obligations issued for reconstruction or improvements of the railways, demised; operating expenses of the demised property including repairs, replacement expenses and expenditures of litigation. The costs of new equipment and expenditures for change of motive power or its increase however shall not be charged as operating expenses, but may be paid from the proceeds of bonds, and interest and other charges thereon shall be taken into account in the ascertainment of the net earnings. As part of the operating expenses there shall be included such proportion of the general expenses of the Traction Company as the gross earnings of the demised property bear to the gross earnings of the railways owned, leased or operated by the Traction Company; a reasonable charge for depreciation of plant and equipment; all taxes including a proportionate part of any taxes assessed on the entire system; all amounts paid on account of injuries to persons or properties by the operation of the railways demised.

The term "net earnings" as used with reference to the entire system of railways shall include all income of every description from railways owned, leased or operated by the Traction Company, and all income from its other property, and there shall be deducted from the gross earnings the above items and also corresponding charges arising in the operation of the other railways controlled by it, together with interest on its bonds. The lessee further assumed to pay all indebtedness of the lessors then existing, or that might thereafter be created at the lessee's request. It further agreed to pay on October 15th, 1908, and each year thereafter, $70,000 of

the principal of the present indebtedness of the lessors exclusive of that represented by mortgage, but said amount is to be payable only out of the net earnings of the Traction Company for the preceding year; any deficiency shall not constitute a charge upon the Traction Company, or any subsequent earnings. No dividend, however, shall be declared or paid in any year on the stock of the Traction Company until this amount is provided for.

Fifth. The new lease contains this specific clause not in the old—that in case of default in the payment of the cash rentals agreed to be paid by the Traction Company, or in case of any other default, and if any such default continue for five months, then the term demised shall expire, cease and determine, and the lessor shall have the right to enter upon and take possession of the demised property, and thereafter operate and control the same and apply the net proceeds to the payment of arrears or of accruing obligations, and when all items are fully paid, it shall restore possession of the demised premises to the lessee. It shall also have the right, if such default shall have continued for the specified period, to sell the lease and all the rights of the lessee at public auction, and apply the proceeds to the satisfaction of all arrears of rent.

Sixth. The new lease further provided that as the amendment was to take effect as of September 1st, 1903, whereas the next quarterly rental would not be payable until January 15, 1904, there should be paid on October 15, 1903, a certain sum equivalent to a continuation of the former rental, such payment to be generally on account of the rent to accrue under the amended lease. Except as amended, the old leases were expressly confirmed.

On the filing of this answer the motion of complainants for a preliminary injunction came on for hearing. Affidavits were filed by both parties and oral testimony was submitted. The motion was argued orally at great length, and supplemental briefs were submitted. Pending the decision of the court it was stipulated that no action should be taken by the defendants under the amended leases.

MACK, J.:—

At the threshold we are met with the objection that this court has no jurisdiction in the premises; that all matters as well as the entire property involved in this litigation is subject to the prior jurisdiction of the Federal court in the creditor bills there pending; that comity bids this court to dismiss the bill and to remit the parties to the Federal court for an adjudication of their rights.

In opposition to this plea, it is urged that the circuit court of appeals has expressly held that this court has jurisdiction and in support thereof reference is made to the decision of that court, reversing the order of Judge Grosscup which restrained the complainants herein from prosecuting their suit.[1]

That the circuit court of appeals believed this court had jurisdiction is apparent from the following language in the opinion rendered by Judge Jenkins:

"We are unable to perceive that the prosecution in the state court of the suit enjoined by the decree appealed from, does in any way interfere with the possession of the *res*, by the receivers or encroaches upon any rightful jurisdiction under this creditors' bill."

I agree however with the argument of defendant's counsel that this decision is not conclusive of the question. The sole issue before the Federal court was whether the power to enjoin an action in the state court, restricted as it is both by federal statute and by the comity that prevails between the Federal and state courts, had been rightly exercised or not, whereas the question here in issue is whether the Federal court has acquired such prior and exclusive jurisdiction over the subject-matter that a state court must or should refrain from acting.

The views of the circuit court of appeals are however very persuasive and reinforce the conclusion to which I have arrived that though the full measure of relief prayed for could not be granted by this court, nevertheless this court has full and complete jurisdiction to determine the rights of complain-

---

[1] See *Guaranty Trust Co. v. North Chicago Street Railway Co.*, 130 Fed. 801. *Certiorari* denied, 194 U. S. 638.—Ed.

ants as stockholders in relation to the corporation itself and to the other stockholders.

The litigation in the Federal court is in no respect in the nature of winding up proceedings; the suits are mere creditors' bills for the enforcement of unpaid judgments and other debts. The entire property and property rights of each defendant corporation are in the custody and control of the Federal court for administration and if necessary, sale, and the stockholders' interests in those assets, being dependent on the rights of the corporation itself, is necessarily within the jurisdiction of that court.

But such control and jurisdiction, for the sole purpose of paying the debts of the corporation, does not subject either the corporation or the stockholders to the exclusive jurisdiction of that court in their relations *inter sese* or oust this court of jurisdiction to determine whether or not the alleged directors are the legal directors of the corporation, whether or not certain acts alleged to have been done by the corporation either through its directors or stockholders, are the legal acts of the corporation, binding upon all stockholders.

That the bill prays for an accounting between the corporations, that is to say a determination of certain liabilities and assets of each corporation—one of the specific objects of the creditor's bill and as to which prior and exclusive jurisdiction is vested in the Federal court—does not deprive this court of jurisdiction to determine other and vital matters as to which relief is sought.

More serious, perhaps, than the objection of lack of jurisdiction over the subject matter, is the objection of lack of necessary parties for a full hearing. It is strongly urged that this court cannot proceed to hear and decide any question here involved, in the absence of the receivers of the several corporations; that none of the receivers are parties defendants or can be made such, without leave of the Federal court, and that for want of necessary parties, the bill must be dismissed.

That all of the property rights of the corporations are vested in the receivers must be conceded; it follows from this,

that the court could not, unless the receivers be made parties to the litigation, determine any matters affecting these property rights, that would be binding on them; and it would follow, ordinarily, that unless the court could bring within the binding effect of its decree all parties having an interest in the subject-matter, it will refrain from acting. But there is no imperative rule, absolutely prohibiting a court of equity from adjudicating the rights of those litigants who are before it, even though such adjudication may affect others without being *res adjudicata* as to them. Irrespective however of this, and conceding that the court should not or could not adjudicate upon matters in which the receivers as such have a direct interest, it does not follow, in this case, that the bill should be dismissed; the same answer may be made to this objection as is made to the point that the Federal court has exclusive jurisdiction, namely, that there are matters properly presented for adjudication as to which the receivers are not necessary parties.

The receivers are not stockholders of the company; they have at the best an equitable interest in some stock; their rights are fully and completely represented by the bank, the legal stockholder and trustee.

Ordinarily a *cestui que trust* is not a necessary party to litigation in which it is fully represented by its trustee. Controversies as to voting power of stock, as to questions of majority rule, as to the legality of the election of and the extent of the power of directors, are not ordinarily within the exceptions to this rule. It may be, of course, that the trustee does not truly represent the *cestui que trust* or that conflicting interests of several *cestuis que trustent* should be brought to the attention of the court, but with these, the other stockholders have no concern; they need look only to their co-stockholders of record in litigation affecting the internal affairs of the corporation. And this I believe to be true even though the case presents a question such as arises here, in which the right of a stockholder of record to vote is questioned, not because of any lack of power of that stockholder as such to act but because of alleged inability of the *cestui*

*que trust* to control the stock or voting power. The ultimate question for decision, nevertheless is, has the bank, the legal stockholder, certain rights; the bank itself is fully capable of defending those rights on its behalf as well as on behalf of its *cestui que trust*. The receivers, therefore, are not indispensable parties even under a stricter doctrine of necessary parties than has been adopted either by the Federal or many state courts. Moreover, any rights that they may have acquired since this court obtained jurisdiction by the filing of the bill and the issuance of process, and with full knowledge of these proceedings, would not prevent this court from acting though the receivers are not made parties. The additional prayers of the supplemental bill are aimed at undoing that which the original bill sought to prevent and it would be the duty of this court to annul any act, the doing of which should and would have been enjoined, but for the intervening injunction of the Federal court, if the rights acquired thereunder were obtained with knowledge of the pendency of this suit.

This leads then to a consideration of the merits of the case on the pleadings, affidavits and testimony heard so far at least as may be necessary in order to determine whether a preliminary injunction should be granted.

There is little controversy on the facts. In the opinion of the court, the charges of fraud or wilful wrongdoing by the protective committee or by those representing the Traction Company in their dealings with the members of the protective committee or with the stockholders of the underlying companies are not sustained.

It may be that the action taken in amending the leases and tripartite agreement was unwise from a business standpoint; it may be that subsequent developments have thrown new light on the situation and that some who once approved would now join hands with those seeking to annul. On these points, the court expresses no opinion and wishes to be understood as not intimating any opinion whatsoever, firstly, because on a business proposition, the judgment of able business men financially interested who, as the court views the evidence, are absolutely free from the slightest personal or material inter-

est in the opposite side of the question, is of greater value than that of the court, and secondly, because, in the absence of fraud, or mistake, and merely because of a difference of opinion on the wisdom of a business act, the court could not undo that which has been done.

It cannot be denied that the Traction Company displayed the utmost care in guarding its own interests when it carefully refrained from permitting a new board of directors of the underlying companies to be elected until it knew just exactly what kind of amendments and modifications would be adopted and recommended by them; and it may be that the protective committee should have insisted on the election of the new directors irrespective of the pending controversies. If such a demand had been conceded, it may be that modifications more favorable to the underlying companies would have been secured. But the failure so to insist, particularly in view of the probable refusal of the Traction Company to grant the demand, cannot be said to be such dereliction of duty or fraud as to lend the weight to the charge that the protective committee was under the domination of the Traction Company. Nor is the fact, expressly stated to the stockholders in the circular letter, that counsel for the protective committee would be paid by the Traction Company and that the committee itself would be similarly reimbursed for the expenses incurred by it, even though it be coupled with the further fact, not stated to the stockholders, that Mr. Robbins had accepted the retainer without a fee and with the express statement by those employing him that they did not know when or how his services would be compensated for, sufficient to charge the committee or their counsel with wrong-doing or neglectful disregard of those interests which alone they purported to represent. It may be that the committee did become legally indebted to Mr. Robbins but if not, it may be that he had such confidence in the outcome, because of the apparent absolute necessity of an adjustment of the differences between the Traction and the underlying companies in order that they might present a united front in their joint controversy with the city, that he was satisfied to take chances on getting his fees.

No opportunity for criticism would have been afforded if
the members of the committee, having and representing large
interests had paid counsel fees and expenses on behalf of all
the stockholders whom they represented or if they, at least,
had guaranteed these payments, irrespective of the success or
failure of the efforts at adjustment.

Nevertheless the court is clearly of the opinion that the acts
of neither the counsel nor the committee were influenced by
the omission to take such steps as the exercise of the highest
degree of prudence would perhaps have demanded.

Irrespective however of the charges of fraud, complainants
contend that the execution of the new document should have
been enjoined and that they should now be declared null and
void as illegal and *ultra vires.*

No citation of authority is required for the well established
proposition that a public service corporation is without power
to grant, by way of lease, all of its property, thereby disabling
it from personally performing its duties to the public. The
state may certainly object to such a lease and any stockholder
who is not otherwise equitably estopped may prevent the con-
summation of such an illegal act.

On the other hand it is equally clear that if the public pol-
icy or statutory law of the state permits such a corporation
to execute such a lease, neither a stockholder nor the state can
object on the ground that the act is illegal.

It may, however, notwithstanding such statute, be *ultra
vires.* The charter granted to a corporation in a state having
such a statute might expressly, provide that the property shall
not be leased. Under such circumstances, though the cor-
poration would be legally empowered to execute a lease so far
as the state is concerned, in other words though the act would
not be illegal or *ultra vires* in the strict sense, nevertheless
as the act would be a breach of the compact between the share-
holders, any shareholder could object and enjoin the trans-
action. But as the right so to object is personal to the stock-
holder, he may, by his acquiescence, estop himself and his suc-
cessors in title from thereafter objecting, and though the pur-
poses for which a corporation is chartered can be changed only

in the manner fixed by statute, yet such an estoppel arising against each stockholder, effectuates a virtual change in the purposes of the corporation. To this extent the distinction sought to be made by complainants between the powers of a corporation and the object and purposes for which it is formed, is good. Though legally capable of doing certain things so far as the state is concerned, the corporation may be enjoined from exercising the power, if such action would be contrary to its declared objects.

The corporation is not merely a creature of the state limited in its powers to those conferred upon it by express terms or reasonable implication therefrom; it is also the creation of the stockholders—created by them for certain definite purposes, to the prosecution of which each has contributed a definite amount of money. Unless the agreement—including therein the law under which the charter is granted—otherwise provides, unanimous consent of the stockholders is required for a fundamental deviation from these agreed purposes or for a change in the relative rights of the shareholders. And even though the charter itself provides that the capital stock may be increased and subsequently provides that all the powers of the corporation are conferred on the board of directors, it is held that only the ordinary powers are there referred to and that the power to increase the capital stock and thus possibly alter the relative interests of the stockholders is so fundamental a change as to require unanimous consent. *Railway Co. v. Allerton*, 18 Wall. 233.

The increase in that case without such consent would not have been an act *ultra vires*, in the strict sense; the corporation had the power—the exercise of it however would have been a violation of the rights of each non-assenting stockholder.

Assuming now that the underlying companies had the power under the law of 1855 to grant, and the Traction Company to accept this lease, can it be said that the execution of such a lease was within the corporate purposes for which the underlying companies were formed. The charter does not expressly provide that a lease shall not be made. The incorporators

must be assumed to have known that the state had waived any objection that it might have had and had expressly conferred this power on any railroad thereafter formed.

That these corporations were formed under the general incorporation act which is silent as to the power to lease is clearly immaterial. In view of the express grant in the act of 1855, it cannot be held that the denial of a power to lease can be implied from the language of the act of 1872.

It is true that the expressly stated object of the corporation was to construct and maintain a street railway. It is also true that the work of a lessor corporation in receiving a fixed rental and dividing it as a dividend, is totally different from that of an operating company. It may be conceded, too, that unless the company were expressly empowered to lease, even a manufacturing corporation, according to some of the authorities, could not, by the mere act of its directors or even without unanimous consent, change its character from an operating to a leasing company.

Nevertheless, as these companies had, on the above assumption the necessary power to lease, their act could not be illegal or *ultra vires* in the strict sense.

Whether the change was so fundamental a character as to come within the principle of the Allerton case, is a question involving a conflict in the authorities. The reasoning in the Beveridge case, 112 N. Y. 1, followed, since the arguments were made herein, in the case of *Wormser v. Metropolitan St. R. R.*, 98 App. Div. 29, Van Brunt, P. J., concurring, and holding that this is an ordinary power vested in the board of directors is very persuasive, notwithstanding the extremely able decision of Van Brunt, J., in *Metrop. El. R. R. Co. v. Manhattan Elev. R. R.*, 11 Daly, 373, to the contrary.

When the court in the Allerton case added the dictum that "changes in the purpose and object of an association are necessarily fundamental," "Mr. J. Bradley evidently had in mind a change in the character of the business like a change from transportation to manufacturing." *Louisville Tr. Co. v. L. N. A. & C. R. Co.*, 75 Fed. 433, 448. See Taft, J., distinguishing the Allerton case.

It is, however, unnecessary to decide whether or not the board óf directors or even a majority of the stockholders could have made the original lease. At least for the purposes of this case we must assume that they were valid inasmuch as they are not attacked by the complainants, and as the complainants pray in their supplemental bill that it be decreed as to them that the original leases and agreement are in full force and effect. Moreover, as every stockholder has acquiesced therein, and as, on the assumption made as to the effect of the act of 1855, the original leases are not *ultra vires* in the strict sense, such assent, together with lapse of time, creates a valid estoppel.

Assuming, however, that the original lease was a fundamental change requiring this unanimous consent to make it valid, is the new lease of the same character? If the original lease had been strictly *ultra vires* and illegal, incapable of ratification and as to which no estoppel could arise, even by direct assent thereto, it might well be contended that the new instrument could not be properly called an amended lease, and that whether amended or original, it virtually changed the purposes of the corporation. If the original lease, however, was not illegal or strictly *ultra vires,* then the company had by unanimous consent of the stockholders and with the express permission of the state, become a mere leasing corporation. What the stockholders had acquiesced in moreover was not, merely, that a certain lease with certain terms should be made, and that thereafter no other lease should be made without a like unanimous consent; they had necessarily also consented that the fundamental character of the corporation should likewise be changed from that of an operating to a mere leasing company. This consent by virtue of the unanimity operated not merely as an estoppel against such consenting stockholder; if it were only this, the argument that the shareholder was thereby estopped from objecting to that particular lease but not to any other would be good. It operated as a contract binding on all and working a change in the corporate purposes. When it was proposed to enter into a new or amended lease, the contemplated act was no

23

longer a fundamental change requiring unanimous consent, it was an important transaction, it seriously affected the interests of the stockholders, but it was only an important not a fundamental change of the company's business. It was such a change as a board of directors usually refrains from making without the sanction of the majority of the stockholders; and in this case, it was expressly conditioned upon such consent.

The board of directors is merely the agent of the stockholders; it has only such powers as are confered upon it by the action of the majority of the stockholders, unless it be otherwise provided by statute. In this state, it is specifically provided that the corporate powers shall be exercised by the board of directors. Notwithstanding such a provision it is held, in some states, that this has reference only to ordinary corporate powers; that important matters must be referred back to the principal, the general body of stockholders.

In *Dickinson v. Consol. Traction Co.*, 114 Fed. 232, it is said by Gray, J.:

"The objection most seriously and strenuously urged is, that although express power may be given to a corporation to lease, that power cannot in the absence of express legislative authority to the contrary, be exercised without the assent of all the stockholders. It is argued with some plausibility that without express legislative authority, a corporation could not make a lease of its property and franchises even with the assent of all its stockholders, and that express legislative authority to make a lease is only a conferring of a power, not existent without such legislative grant, upon the whole body of stockholders. Many cases have been cited in the brief and in the argument to support these propositions. The distinction, however, between these cases and the one at bar, is that the former concern grants of legislative power to lease to corporations already in existence and whose stockholders have subscribed under the conditions of the original charter by which no such power was given. The implied contract between the stockholders *inter sese* in such cases, is as already stated that no such additional power so radical in its nature, though conferred by legislative authority, shall be capable of being exer-

cised without the assent of all the stockholders. In the case before us, however, the power to lease was conferred by the act under which both corporations were formed. * * * The power to lease having been so given without prescribing any mode in which it was to be exercised, it must be classed with the general powers conferred by a charter which are to be exercised by the majority of corporators of stockholders." See, too, Baldwin, Railroad Law, 455.

In the Beveridge case, on the other hand, it is held that the right so to lease is within the powers conferred on the board of directors.

Despite the fact that directors conditioned the lease upon the assent of the majority of the stockholders, it may be important to determine whether such assent would otherwise have been necessary, because, if the board of directors, acting alone, had had the power, then the question of the true meaning of the expression "a majority of the stockholders," whose ratification was made on condition precedent to the execution of the lease, depends solely upon the intention of the board of directors;—that is to say, if they needed no sanction but voluntarily made their act conditional upon ratification by certain parties, described by them as "a majority of the stockholders," in a conflict as to the interpretation of this expression, the intention of the board of directors, if discoverable, will govern, even though the expression would ordinarily have a different meaning. On the other hand, if action by a majority of stockholders is required by law, it must be ascertained what the law intends by a majority and in determining this, the intention of the board of directors is entirely immaterial.

Moreover if it be held that the board of directors alone have this power, the question raised by the complainant as to the legality of the election of the new directors becomes important.

Complainants contend that all vacancies in the board of directors must be filled by the stockholders. Const. Art. XI, s. 3; R. S. ch. 32, s. 3.

The language of the constitution and the statute is "that

in all elections for directors'' every stockholder shall have the right of cumulative voting, and that ''such directors shall not be elected in any other manner.'' The statute also provides for a classification of directors so as to permit of elections for three years and concludes ''all other vacancies to be filled in accordance with by-laws.'' Complainants urge that the word ''other'' means ''other than directors.'' Defendants say that it means ''vacancies, including that of directors, other than by expiration of term of office,'' and that both constitution and statute refer only to the regular annual elections and not to the temporary appointments for unexpired terms.

The universal practice in Illinois for at least 35 years is in accordance with defendants' views. While not conclusive of the question, nevertheless this fact is entitled to great weight in arriving at a correct interpretation. This court is not disposed to overthrow a practice so long established, especially in view of the fact that the clear purpose of the constitutional provision was to provide for minority representation—not otherwise to regulate the election of directors. This end would be even less attainable if stockholders rather than the directors are to fill each single vacancy as it arises. The court therefore holds that the *de facto* directors are also directors *de jure*.

The changes in the lease were important; they did not, however, fundamentally change the business or purposes of the corporation as they then were established. Whatever may be the right of the stockholders on an original lease, the board of directors must be held to have authority in Illinois to make the changes here in question. The most important of these, the only ones in fact that can be deemed of great importance to the stockholders of the underlying companies were the waiver of the right of forfeiture for alleged defaults and the decrease in the rental to be paid.

What, then, did the board of directors mean when they required that the lease delivered in escrow should be turned over to the lessee ''in case and when the same shall be approved by a majority of the stockholders of this company,'' and that a special meeting of the stockholders should be

called "for the purpose of considering and voting upon the question for approving the action of the board of directors," etc.

Does this require a majority of the stock of the company or a majority of the stock voted or represented at the meeting; and if the stock of the company, does it include such stock as is outstanding but which, because of an illegal holding or for some other reason, cannot legally be voted?

The board of directors knew that a part of the stock was held in trust by the bank under the tripartite agreement; they knew that there would be some question as to the legal power to vote this stock; they knew that excluding this stock from voting, but including it in the total stock; they did not at the time control a majority of the stock. In the recommendations for modifications of the lease adopted by them as a solution of the difficulties, they say:

"6th. The modifications when made shall not go into effect *against* the objections of a majority in interest of the stockholders," and in the circular letter to the stockholders, dated July 25, 1903, they say, referring to the advantages of the changes, "2nd. It will not be possible any longer for the lease to be modified by a directory elected by a bare majority of your stock including 'the bank stock;' it will require the sanction of five-eighths of the entire stock; that is, a majority of the stock excluding these 32,000 shares."

If the language of the resolution is to be interpreted according to the intentions of its framers, then clearly in the light of these contemporaneous documents it must be held that the only sanction required was that of the holders of a majority of the stock, including the bank holdings, irrespective of whether the latter could legally be cast or not—*i. e.*, unless a majority or, at any rate, one-half of the stock either did not vote or voted against the changes, they should become effective. This condition was complied with. Counting the bank stock, a majority favored the change. Excluding it, a majority of the other shares favored the change. In any event, not a majority of the total issue, including all not voting with the opponents of the resolution, disapproved of it.

If, however, the court be wrong in considering these other

documents, and if only the usual and customary meaning of the language of the resolution is to be sought, or if the court be wrong in holding that the directors would have had the right to adopt the new leases without consulting the stockholders, and if it be the law that the sanction of the holders of a majority of the shares is essential, it then becomes necessary to consider whether that sanction has been given.

Complainants contend that one Illinois corporation cannot own stock in another Illinois corporation except under certain exceptional circumstances, not necessary to be here considered; that such holding is both *ultra vires* because of lack of charter power and illegal as against the public policy of the state; that though the legal title is vested in the bank (whose corporate power to hold and vote stock, the beneficial interest of which is in an individual, would not be questioned), nevertheless the equitable title is in one or both traction corporations; that such equitable control is equally void as against public policy and *ultra vires;* that whilst the stock is outstanding and would, at dissolution, be entitled to share in the distribution and is therefore to be counted as a part of the capital stock of the corporation, nevertheless the voting power is suspended during the pendency of the illegal and *ultra vires* holding; that notwithstanding the suspension of the voting power, at least the clear majority of all outstanding stock, counting the illegally held portion to ascertain the total issue, but not counting it as voting, is essential to the validity of the new lease.

So far as this requirement is based on the language of the resolution as requiring perhaps something more than the law would otherwise have demanded, the answer is that either the specific intention of the directors must control the interpretation of the language, or a general intention to require that which the law itself demands for a majority whatever that may be, must be attributed to them. If the former, then as heretofore stated, a majority have sanctioned the transaction.

It remains, therefore, to inquire what the true meaning of "majority" is, under the rule that the assent of a majority of the stock is needed. The authorities conflict as to whether,

at a regularly called meeting, a majority of the shares represented, a quorum being present, is empowered to bind the entire body. If it be, then a majority has sanctioned the new lease.

If, however, it be the law that a majority of the shares represented is not sufficient and that a majority of the entire outstanding stock is required, then the further question remains —shall stock incapable of being legally voted be counted as part of the outstanding issue for the purpose of determining what is a majority? Suppose a clear majority of the stock were so illegally held; it would follow that unless this were corrected, no business could ever be transacted, no election of directors ever be held while this situation lasted. The minority instead of being protected would be rendered powerless. It follows that such illegally held stock is not to be counted; that a majority of the balance of the stock is the majority that the law would demand, whenever corporate action requires this sanction. And a similar meaning would be given to the language of the resolution here in question, if the intention that must be attributed to the directors is to control. In this sense then, too, a majority of the stockholders have given their sanction.

If, however, a clear majority of all stock is necessary, then we must ascertain whether the stock deposited with the bank may be legally voted.

The public policy of Illinois clearly forbids the acquisition by one corporation of a majority of the stock of another corporation for the purpose of controlling it. This much is established by the decisions of the supreme court.

There is no express legislation forbidding or permitting the holding of a minority interest, except in specific cases. For some purposes, as in payment of an honest debt, such acquisition may be made as incidental to the express powers. Ordinarily a corporation is not in business for the purpose of investing its moneys, but for the purpose of employing them in its normal and legitimate enterprises. The purchase of the stock of another corporation for investment purposes is therefore generally beyond the corporate power. It may,

however, in the due course of business become essential to invest part of the funds as in this very case. The Traction Company had to set aside ten million dollars as security for its obligation. It had to buy securities of some kind for this purpose. Can it be said that it must purchase bonds; that it cannot do what business men would ordinarily do under like circumstances; that it cannot buy stocks of the lessor company as long as those stocks do not enable it to control the company? Clearly the mere holding of stock for some purposes is not necessarily *ultra vires*. Whether *ultra vires* or not, depends upon the purposes of the acquisition. Moreover that which at one time is not *ultra vires* may become so. One corporation may innocently acquire a small interest in another corporation in payment of a debt, and may thereafter purchase an additional minority interest for the purpose of securing control. It cannot be doubted that the entire holding would become *ultra vires* and illegal in Illinois under such circumstances.

The supreme court in *People ex rel. v. Ch. Gas Tr. Co.*, 130 Ill. 268, 284, referring to insurance corporations which may find it necessary to keep funds on hand for the payment of losses, says: "But it is questionable whether even these can invest their surplus funds in the stocks of other corporations without special legislative authority."

And in *People v. Pullman Car Co.*, 175 Ill. 125, 159, they say: "That a corporation cannot become a stockholder in another corporation unless power to do so is specifically granted in its charter or necessarily implied from it."

While it would follow from these decisions that ordinarily in Illinois one corporation cannot acquire even a minority interest in another corporation, yet the court does not lay down an absolute rule to this effect which would control under the circumstances of this case.

The act of June, 1897, as amended by the act of May 11, 1903, demonstrates, however, that it is not against the public policy of Illinois for one street railway company to hold stock in another street railway company under certain circumstances.

In view of this legislative declaration and in the absence of an express decision to the contrary in this state and the conflict of authority in other states, in view of the necessity of making an investment as collateral security for the lease, it must be held that the corporation had the implied power to invest its funds, incident to the express power of acquiring a street railroad by lease and that the investment in these stocks, not having been made for the purpose of securing control and not directly tending to secure such control, was not illegal as against the public policy of Illinois or *ultra vires* as beyond the corporate power of the Traction Company.

But even if the *cestui que trust* could not legally hold the stock, it would not follow that the trustee, the stockholder of record, would, because of this, be debarred from voting it. The court adheres to the opinion heretofore rendered in *Dunbar v. Kellogg Switchboard Co.*,[1] that the corporation and the other stockholders are not concerned with the beneficial ownership in determining the right of a stockholder of record to vote.

In view of what has been said, it becomes unnecessary to determine whether the fact that the equitable rights have become vested in individuals, the receivers, revived the alleged suspended voting powers; or whether the complainants can be heard to urge these objections.

It must therefore be held on this record that the new or amended leases and agreement have been validly adopted and are in full force and effect if the original assumption that the act of 1855 (private laws, pp. 304, 305) enabled the underlying companies to become lessors and the Traction Company to become lessee. A want of power in either lessor or lessee would render the transaction null and void. *St. Louis R. R. Co. v. Terre Haute R. R.*, 145 U. S. 393.

The act of 1855, entitled "An act to enable railroad companies to enter into operative contracts and to borrow money," provides that all railroad companies incorporated or organized under the laws of this state shall have power to

---

[1] This case was reversed by the supreme court. See 224 Ill. 9 (Dec. 19, 1906).—ED.

make such contracts and arrangements with each other and with railroad corporations of other states for leasing or running their roads or any part thereof.

No restriction is placed on the length of term. The entire road may be leased. If this can be done, there can be no objection to a lease of all the other property of the corporation even though its character changes from that of an operating to a mere leasing company. The underlying companies could therefore lawfully execute the leases as lessors.

In *Union Traction Co. v. City of Chicago,* 199 Ill. 484, 544, the court says, "The act of 1855 has reference to the making of contracts and arrangements between railroad companies already existing and in operation, for the leasing or running of their roads." Attention was directed to this sentence in a petition for rehearing containing a number of points. The petition was denied and the opinion remained unmodified. The statement, however, was purely incidental as was also the further statement on p. 545. "Indeed it is questionable whether appellant was properly organized for the purpose of leasing other railroads and terminating the performance of their duties to the public. Corporations, organized under the general incorporation act, may be formed in the manner provided by that act, for lawful purposes only. If, however, the leasing of other roads exclusively was a lawful purpose of appellant's organization, it certainly was obliged to operate such roads in accordance with the provisions of its own charter and not in violation thereof."

The point that the court was discussing and which it determined, was whether the lessee could get the benefit of certain privileges granted to the lessor. This depended on whether the lessor could operate under lessor's charter. The court held, that under its own charter, it lacked power to operate in accordance with lessor's charter and therefore it must, in operating, comply with its own charter and submit to council regulations.

It is urged that when the original lease was made, the lessee did not own, control or operate any road. But what standing in a court of equity has the complainant who on this

ground seeks to annul the second lease while at the same time he asks to have the original lease declared to be in full force.

Moreover, even though it be held that because the Traction Company was not an operating road on June 1, 1899, the lease when made was null and void and could have been repudiated by the lessors, yet if this lessee subsequently remedied this defect in its leasing power by acquiring and operating a road, the lease, not heretofore repudiated and subsequently recognized by both parties and all of their stockholders as in force, would become valid.

It is conceded that the company acquired and operated a certain extension under the city ordinances of June 4, and September 24, 1900. If the original leases are absolutely void then this extension belonged absolutely to the Traction Company so that it was enabled to execute a lease in July, 1903. That this instrument is or is called an amendment of the old lease which for the sake of the argument, may be assumed to be void, does not render it invalid. It is full and complete in itself, by virtue of the confirmation clause.

But even if the lessor companies have some interest in the extension constructed under these ordinances by virtue of the terms of the lease, nevertheless the essential fact remains that the Traction Company did become an operating company by its own act in seeking, obtaining and complying with the terms of these ordinances.

On the record before this court, it cannot be said that the Traction Company was organized solely for the purpose of leasing other roads; it cannot be held that it was not an operating road in 1900, if under the foregoing dicta, this is essential.

The court holds that the act of 1855 is not in conflict with the general incorporation act. It is therefore not expressly repealed. Repeals by implication are not favored. The supreme court moreover has assumed in the transfer cases that the act of 1855 is in full force. The court therefore further holds that it is not repealed by implication either by the general incorporation act or by the Allen bill.[1]

---

[1] See Session Laws of 1897, pp. 282–285. This law was thereafter repealed. See Session Laws of 1899, p. 331.—ED.

A much earlier decision might have been rendered in the ·case in view of the fact that it is on a motion for a preliminary injunction. But the presentation of it was as complete as ·on a final hearing and the extremely able and exhaustive arguments of all of the counsel engaged in the case, as well as the importance of the questions involved, demanded and merited a careful consideration of all the facts presented and an ·examination of the authorities.

The motion for a preliminary injunction is overruled and the application denied